**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

CHRYSTAL N. WILLIAMS,       )     CASE NO. 1:15CV00829
                            )
         Plaintiff,         )
                            )     MAGISTRATE JUDGE
         v.                 )     VECCHIARELLI
                            )
CAROLYN W. COLVIN,          )
    Acting Commissioner of Social )
    Security,               )     **MEMORANDUM OPINION AND**
                            )     **ORDER**
         Defendant.

Plaintiff, Chrystal N. Williams ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying her applications for Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This case is

before the undersigned United States Magistrate Judge pursuant to the consent of the

parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth

below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In September 2007, Plaintiff filed applications for POD, DIB, and SSI, alleging a

disability onset date of January 1, 2006.  (Transcript ("Tr.") 974.)  The claims were

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On April 29, 2011, an ALJ held Plaintiff's

hearing.[1]  (Tr. 24-68.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On June 8, 2011, the ALJ found Plaintiff not disabled.  (Tr. 9-17.)  On December 20, 2011, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 974.)

Plaintiff then filed a civil action in the United States District Court for the Northern District of Ohio, challenging the denial of benefits.  *See Williams v. Comm'r of Soc. Sec.*, Case No. 1:12CV358 (N.D. Ohio.)  On March 19, 2013, Magistrate Judge Kathleen Burke issued a Report & Recommendation that the June 2011 ALJ decision be reversed and the case remanded for further proceedings.[2]  (*Id.* at Doc. No. 19.)  Over Objections filed by both the Commissioner and Plaintiff, District Judge Benita Pearson adopted the magistrate judge's Report & Recommendation on May 28, 2013.  (*Id.* at 24.)

In July 2013, the Appeals Council remanded the case to the hearing level for further proceedings.  (Tr. 974.)  The case was assigned to a different ALJ, who conducted a hearing on March 18, 2014.  (Tr. 1015-1079.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A medical expert ("ME") and

---

[1] The hearing was initially scheduled for March 9, 2011, but rescheduled after Plaintiff was unable to attend due to car problems.  (Tr. 70-75.)

[2] Specifically, Magistrate Judge Burke recommended reversal and remand "because the ALJ found moderate limitations in concentration, persistence or pace, but did not include a speed, pace, or other durational limitation and did not explain why he chose not to include such a limitation in the RFC and hypothetical question to the VE."  *Williams v. Comm'r of Soc. Sec.*, Case No. 1:12CV358 (N.D. Ohio) (Doc. No. 19 at 18-19.)  Judge Pearson adopted Magistrate Judge Burke's Report & Recommendation in its entirety.  (*Id.* at Doc. No. 24.)

2

VE also participated and testified.  (*Id.*)  On April 10, 2014, the ALJ found Plaintiff not disabled.  (Tr. 974-990.)  On February 27, 2015, the Appeals Council declined to assume jurisdiction, and the ALJ's decision became the Commissioner's final decision.[3] (Tr. 965- 969.)

Plaintiff filed a complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 20,22.)

Plaintiff asserts the following assignments of error:

(1)    "After treating her regularly for almost three years, psychiatrist Dr. Rao concluded that Williams was unable to keep a regular work schedule on a sustained basis.  The ALJ discounted this opinion without noting the supporting findings and opinions, and the reasons the ALJ gave were not the required good reasons.  This violated the treating physician rule."

(2)    "The agency's examining psychologist, Dr. Smith, reported that Williams was moderately impaired in her ability to withstand the stress and pressure of day-to-day work activity.  The decision failed to state or explain the weight it gave to that opinion.  This violated the agency's rules."

(3)    "The decision erred by relying on the opinions of the non-examining testifying psychologist.  The opinions were inconsistent and subject to improper pressure from the ALJ."

(Doc. No. 16.)

## II.    EVIDENCE

## A.    Personal and Vocational Evidence

---

[3] The Appeals Council decision contains a detailed discussion of Plaintiff's objections to the ALJ decision.  (Tr. 965-969.)  However, the Appeals Council expressly states that it "found no reason under our rules to assume jurisdiction," and explains that the ALJ's decision is the final decision in this action.  (*Id.*)  Both parties to this action agree that this Court has jurisdiction to review the ALJ decision, and not the written decision of the Appeals Council.

Plaintiff was born in June 1981 and was 24-years-old on the alleged disability onset date and 32-years-old on the date of the hearing.  (Tr. 32, 1021.)  She had the equivalent of a high school education, as well as some community college, and was able to communicate in English.  (Tr. 1021-1022.)  She had no past relevant work.  (Tr. 988.)

## B.   Relevant Medical Evidence[4]

### 1.    Medical Reports

On March 18, 2006, Plaintiff presented to the emergency room ("ER") with complaints of increased stress and depression.  (Tr. 318.)  She reported several life stressors, including her relationship with her father, her pregnancy, and the anniversary of the death of her son.  (*Id.*)  Plaintiff stated that "I know I'm bipolar," and requested medication.  (*Id.*)  She denied suicidal ideation.  (Tr. 318-319.)  On examination, Plaintiff's attitude was cooperative, trusting, and secure.  (Tr. 319.)  Her mood was appropriate, and she exhibited intact thought process, normal speech, and normal thought content.  (*Id.*)

Plaintiff was diagnosed with adjustment disorder with depressed mood, and assigned a Global Assessment of Functioning ("GAF") of 60, indicating moderate symptoms.[5]  The ER clinician determined hospitalization was not warranted and

---

[4] As Plaintiff's assignments of error relate only to her mental impairments, the Court will confine its discussion of the medical evidence to those impairments.

[5] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale

discharged Plaintiff home.  (Tr. 321.)

Plaintiff thereafter began treatment with psychiatrist Douglas Lee, M.D.  (Tr. 389.)
Dr. Lee performed an initial psychiatric evaluation on March 28, 2006, during which he
noted that Plaintiff was six months pregnant and "is here to get medication for anti-
depressant so she can get help to deal with her depression and stress."  (*Id.*)  Plaintiff
reported having had a "nervous breakdown" earlier that month, and stated she had
been diagnosed with bipolar disorder.  (*Id.*)  Plaintiff felt "overwhelmed" and unable to
cope with "her life in general, planned pregnancy and raising three children."  (Tr. 390.)
Dr. Lee noted he had spoken with Plaintiff's obstetrician, who approved treatment with
anti-depressant medication.  (Tr. 389-390.)  Dr. Lee diagnosed adjustment disorder and
mood disorder, and prescribed Zoloft.  (Tr. 391.)

In April 2006, Plaintiff reported that Zoloft was helping with her symptoms.  (Tr.
392.)  Dr. Lee's treatment note described Plaintiff as relaxed, calm, happy and smiling.
(*Id.*)  Plaintiff returned in July 2006, after the birth of her daughter.  (Tr. 393.)  Dr. Lee
noted that "mom and baby [are] all healthy," and described Plaintiff as being in a happy
and cheerful mood.  (*Id.*)  He continued Plaintiff on Zoloft.  (*Id.*)  In August 2006, Plaintiff
reported no depressive episodes since the birth of her daughter.  (Tr. 394.)  Dr. Lee
observed that Plaintiff was happy, pleasant, and friendly with a bright affect.  (*Id.*)
Plaintiff had no complaints in September 2006, and reported working as a school bus
driver in November 2006.  (Tr. 394-395.)

--------

because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

5

Plaintiff returned to Dr. Lee on seven (7) occasions in 2007.  (Tr. 396-400.)  She reported increased stress in February 2007, at which time Dr. Lee added a prescription for Ativan.  (Tr. 396.)  Thereafter, Dr. Lee generally described Plaintiff as calm, stable, and ""doing well" with "no complaints."  (Tr. 397-399.)  In July and August 2007, Plaintiff reported working full time as a saleswoman.  (Tr. 398-399.)  Dr. Lee discontinued Plaintiff's Ativan, prescribed Klonopin, and increased her Zoloft.  (Tr. 398.)  In October 2007, Plaintiff stated she was no longer working because she did not have a car.  (Tr. 400.)  Plaintiff reported poor sleep, and Dr. Lee increased her Klonopin.  (*Id.*)

It does not appear that Plaintiff sought further mental health treatment until May 2008.  (Tr. 514.)  During a mental health needs assessment at that time, the evaluating clinician (whose name is illegible) noted mildly irritable mood, constricted affect, and no suicidal ideation.  (*Id.*)  The clinician also stated that there is "[s]ome question as to [Plaintiff's] contention that she has Bipolar Disorder."  (*Id.*)

Plaintiff reported worsening mood in June 2008.  (Tr. 513.)  She indicated "stressors of lost relationship, stressors of being a single mom with four children, finances, and going to school."  (*Id.*)  Plaintiff also reported being out of medication. (*Id.*)  The clinician noted Plaintiff was tearful with a depressed mood, and advocated for "an emergency psych evaluation with the Medical Director."  (*Id.*)  It appears Plaintiff underwent an emergency psychiatric evaluation on June 27, 2008.[6]  (Tr. 511.)

On July 25, 2008, Plaintiff began treatment with psychiatrist K. Srinivasa Rao,

_____

[6]The medical record contains a treatment note indicating Plaintiff underwent an emergency psychiatric evaluation on June 27, 2008, but the parties do not direct the Court's attention to the results of the evaluation itself.

6

M.D. (Tr. 510.) Plaintiff reported feeling "somewhat better" and Dr. Rao noted "moderate improvement." (*Id.*) Dr. Rao's handwriting is difficult to decipher, but it appears he prescribed Effexor and Seroquel. (*Id.*) The parties do not direct the Court's attention to any further treatment notes until September 2009. (Tr. 633.) It appears, however, that Dr. Rao adjusted Plaintiff's medications between July 2008 and September 2009, increasing her Effexor dosage and at various points adding Vistaril, Klonopin, and Wellbutrin. (Tr. 649.)

In September 2009, Plaintiff presented to the Nord Center for an Individual Service Plan. (Tr. 633-634.) At that time, she reported the following symptoms: "poor appetite, always fatigued, no motivation or energy, isolates, irritable, frequent crying spells, suicidal ideations and attempts in the past, feeling worthless, short temper, yells, screams, curses, assaulting other adults, difficulty with focus and concentration, impulsive spending, risk-taking, promiscuity, . . . manic symptoms [that] last a day of irritable, yelling, cursing, screaming, chronic insomnia at night but sleeps in the day." (Tr. 634.) Plaintiff indicated numerous stressors, including legal and financial problems and relationship issues with her daughter's father. (Tr. 648.) Dr. Rao increased her Wellbutrin dosage. (Tr. 647.)

During the period September 2009 through March 2010, Plaintiff continued to report numerous life stressors, many of which related to her financial and physical health problems. (Tr. 635-648.) Treatment notes throughout this time period described Plaintiff's affect as depressed, agitated, frustrated and flat. (*Id.*) By July 2010, however, Plaintiff reported "feeling much better." (Tr. 925-926.) She indicated no mood swings, irritability, or overt depression. (*Id.*) Dr. Rao continued her prescriptions for Trileptal,

7

Wellbutrin, Effexor, Vistaril, and Klonopin "to sustain the improvement." (*Id.*) In October 2010, therapist Melani Richards, MSW, LSW, described Plaintiff's mood as "good" and noted "some progress." (Tr. 920-923.) The following month, Ms. Richards noted "good progress," despite Plaintiff's reports of continuing health issues and "financial frustrations." (Tr. 918.) In January 2011, Ms. Richards noted some tearfulness, but nevertheless noted "some progress" in Plaintiff's overall condition. (Tr. 914-917.)

On April 20, 2011, Dr. Rao completed a Medical Source Statement concerning the nature and severity of Plaintiff's mental impairments.[7] (Tr. 963-964.) Dr. Rao indicated a diagnosis of mood disorder. (Tr. 964.) He found Plaintiff was less than moderately limited in her ability to remember, understand, and follow simple directions; and moderately limited in her abilities to maintain attention and concentration for two hours periods of time and perform work at a reasonable pace. (Tr. 963-964.) Dr. Rao further concluded that Plaintiff was markedly limited in her abilities to (1) keep a regular work schedule and maintain punctual attendance; (2) interact appropriately with others (e.g., public, supervisors, co-workers); (3) withstand the stresses and pressures of routine simple unskilled work; and (4) make judgments that are commensurate with the functions of unskilled work, i.e., make simple work-related decisions. (*Id.*)

As explanation for his opinions regarding Plaintiff's marked limitations, Dr. Rao stated that Plaintiff "has a low threshold for stress and tends to become irritable and

---

[7] Plaintiff also presented to Dr. Rao for an appointment on April 20, 2011. (Tr. 1359.) The treatment note for this visit, however, is handwritten and extremely difficult to decipher, as are all of Dr. Rao's treatment notes. It appears that he assessed "partial symptom remission" at this visit, and "fair symptom remission" during visits in September and December 2011. (Tr. 1357-1359.)

8

agitated rendering her unable to keep a regular work schedule on a sustained basis."
(Tr. 963.)  He further noted that "Patient has residual symptoms of depression and
anxiety and mood swings as well as her low threshold for stress which make it difficult
to work on a sustained basis in any job situation."  (Tr. 964.)  He concluded by stating
that "[i]n view of the above as well as her poorly controlled respiratory problems, patient
is unlikely to work in any job on a sustained basis in the near future." (*Id.*)

In August 2011, Plaintiff presented to the ER complaining of numbness in her
face, arms, and legs, which then spread to her chest and feet.  (Tr. 1289.)  On
admission, she was crying and exhibited a depressed mood.  (Tr. 1303.)  Plaintiff was
hospitalized for testing, including neurological and psychiatric evaluations. (Tr. 1289-
1309.)  Neurologist Darshan Majahan, M.D., assessed a conversion reaction,[8]
concluding that "numbness in the face spreading through the rest of her body was
probably related to anxiety and possible hyperventilation."  (Tr. 1293.)  Psychiatrist S.
Erfan Ahmed, M.D., diagnosed a mood disorder and found that "it is not possible . . . to
comment on . . .whether Plaintiff is actually going through a conversion disorder or not."
(Tr. 1291.)  He assessed a GAF of 55, indicating moderate symptoms; concluded that
psychiatric intervention was not warranted "at this time;" and declined to adjust Plaintiff's
medications.  (Tr. 1290-1291.)

In February 2012, Plaintiff underwent a psychological pain management
evaluation with Sara Davin, Psy.D.  (Tr. 1386-1389.)  Plaintiff reported sadness,

---

[8]A "conversion disorder" is a mental condition in which a person has blindness,
paralysis, or other nervous system (neurologic) symptoms that cannot be
explained by medical evaluation.  *See* https://www.nlm.nih/gov/medlineplus.

irritability, anger, frustration, constant worrying, tearfulness, reduced appetite, and difficulty sleeping.  (Tr. 1387.)  Dr. Davin noted a "DASS depression score of 10 suggest[ing] mild depression and DASS anxiety score of 10 suggest[ing] mild anxiety." (*Id.*)  On examination, Dr. Davin noted marginal cooperation, agitated and irritable affect, preoccupation with somatic concerns, and "preoccupation with blame towards the medical profession."  (Tr. 1388.)  She also, however, noted good attention span and concentration, logical thought content, and fair judgment and insight.  (*Id.*)  Dr. Davin concluded that "[w]hile [Plaintiff] is a candidate for the Chronic Pain Rehabilitation Program, her motivation for treatment was unclear during this visit."  (*Id.*)

Finally, Plaintiff presented for treatment with Dr. Rao and/or Ms. Richards on numerous occasions between December 2011 and December 2013.  (Tr. 1311-1366.) Aside from occasional reports of increased anxiety and mild depression, Plaintiff was generally reported to be making "some progress" and in "fair symptom remission" throughout 2012.  (Tr. 1329-1354.)  Ms. Richards noted that Plaintiff was "busy with college classes" during most of that year; however, in November 2012, Plaintiff reported that she had "missed so much school that she will need to withdraw."  (Tr. 1333-1334.) Plaintiff reported anger, frustration, anxiety and increased depression through the first half of 2013.  (Tr.  1317-1327.)  In July 2013, Plaintiff reported improved mood and was found by Dr. Rao to be in "fair symptom remission."  (Tr. 1314-1316.)  In October 2013, Dr. Rao noted that Plaintiff seemed somewhat irritable and that her affect was constricted.  (Tr. 1311.)  He increased her Trileptal and Klonopin dosage, and continued Effexor, Wellbutrin, and Vistaril.  (*Id.*)

**2.     Agency Reports**

10

In January 2008, Plaintiff underwent a consultative psychological examination with Ronald D. Smith, Ph.D.  (Tr. 408-414.)  Plaintiff reported "a history of periodic episodes of depression associated with frustration, with frequent crying, lowered frustration tolerance, and increased angry outbursts."  (Tr. 412.)  She stated that, at the age of 17, she went to the emergency room because "they said I was a threat to myself."  (Tr. 410.)  At that time, she was referred for outpatient psychiatric care, which she attended "for a month or two."  (*Id.*)  Plaintiff further reported that she had "gone back to the hospital twice in the last two years with 'nervous breakdowns' when she felt she needed to go before she would hurt herself due to suicidal impulses."  (*Id.*)  Plaintiff indicated that she had been seeing a private psychiatrist since 2005, and taking Zoloft.  (Tr. 411.)  She reported daily crying spells, anxiety, and periodic suicidal thoughts.  (*Id.*)

Plaintiff indicated prior work experience as a cook, state tested nursing assistant ("STNA"), and salesperson.  (Tr. 409.)  She stated that she liked her last job (in sales) and "got along with almost everybody."  (*Id.*)  Plaintiff indicated she went on leave from that job "because she dislocated three bones in her foot 'and also because of [her] bleeding issues.'"  (*Id.*)  She reported that "one doctor said she should stay off her foot and another doctor said she should stop pushing herself."  (Tr. 410.)

On examination, Dr. Smith noted Plaintiff was "neat and clean" in her appearance, and "direct and to the point in her responses and well organized in her thinking."  (Tr. 411.)  Her insight and judgment were fair.  (Tr. 412.)  Dr. Smith observed that Plaintiff was emotionally labile but her affective expression was appropriate.  (*Id.*)  Plaintiff was alert and "in good contact with reality," and denied significant hallucinatory events.  (*Id.*)

11

Dr. Smith diagnosed dysthymic disorder, early onset; impulse control disorder; and personality disorder.   (Tr. 413.)  He assessed a GAF of 55, signifying moderate symptoms.  (*Id.*)  Finally, Dr. Smith reached the following conclusions regarding Plaintiff's work-related mental abilities:

1. Chrystal Williams, according to her past work history, would appear to be not impaired in her ability to work with supervisors or the general public.  However, she would appear to be mildly impaired in her ability to work with peers or fellow workers.

2. Her ability to understand, remember, and follow instructions would appear to be not impaired.

3. Her mental ability to maintain attention and concentration may be mildly impaired at times when she becomes frustrated and then her performance will suffer and deteriorate with increased worry and depressive feelings.

4. Her mental ability to withstand the stress and pressure of day to day work activity will be moderately impaired.  She appears to have low frustration tolerance and when faced with difficulties tends to lapse into feelings of depression and being discriminated against.

5. She would appear to be capable of managing funds if they were awarded.

(Tr. 414.)

On January 21, 2008, state agency physician David Demuth, M.D., reviewed Plaintiff's medical records and completed a mental residual functional capacity ("RFC") assessment and psychiatric review technique.  (Tr. 415-431.)  Dr. Demuth found Plaintiff had mild limitations in activities of daily living; moderate limitations in social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (Tr. 429.)  He further concluded Plaintiff was moderately limited in her abilities to: (1) to complete a normal workday and workweek

12

without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (2) interact appropriately with the general public.  (Tr. 416.)  She was not significantly limited in her abilities to remember locations and work-like procedures; understand, remember, and carry out short, simple, and detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, respond appropriately to changes in the work setting.  (Tr. 415-416.)

In the narrative section of the RFC assessment, Dr. Demuth stated that Plaintiff's allegations were "not fully credible."  (Tr. 417.)  He opined she had a "reduced stress tolerance" but could carry out multi-step tasks.  (*Id.*)  He further found Plaintiff could "carry out tasks in situations where duties are relatively static and changes can be explained;" and could do "tasks that do not require independent prioritization or more than daily planning."  (*Id.*)  Finally, Dr. Demuth opined that Plaintiff was "moderately reduced for public interaction [and] works best in small groups or alone."  (*Id.*)

In August 2008, state agency physician Cindy Matyi, Ph.D., reviewed Plaintiff's medical records and found that Dr. Demuth's analysis was "generally an accurate reflection of the claimant's condition and residual functional capacity."  (Tr. 522.)  Dr. Matyi affirmed Dr. Demuth's opinion with the following exceptions: "(1) the claimant's allegations are consistent with the evidence and are credible; (2) her capacity for understanding, remembering, and carrying out detailed instructions, her ability to

13

maintain attention/concentration for extended periods, and her capacity to adapt to change (blocks 3, 5, and 6, and 17 on the MRFC) are moderately restricted."  (*Id.*)  Dr. Matyi further remarked that "while the opinions of the CE examiner [Dr. Smith] are generally supported by the other evidence in file, the preponderance of the data suggests that his conclusions concerning the foregoing areas are mild underestimates." (*Id.*)

**C.    Hearing Testimony**

    **1.    Plaintiff's Hearing Testimony**

        **a.    April 29, 2011 Hearing**

During the April 29, 2011 hearing, Plaintiff testified as follows:

- She has a ninth grade education and is able to read and write.  (Tr. 32-33.) She lives with her four minor children, ages 4, 10 (twins), and 13.  (Tr. 53.) Her father lives across the street and helps with the children.  (Tr. 42.)

- She suffers from numerous physical conditions, including asthma, vaginal hemorrhaging, histoplasmosis, and recurrent bronchitis.  (Tr. 34-38.)  She also experiences migraine headaches, arthritis in her back and hip, and foot pain stemming from a right ankle fracture in 2007.  (Tr. 39-41, 58, 60-61.)

- In terms of surgical procedures, she has had a hysterectomy; lung surgery to remove her lymph nodes and take biopsies; and gallbladder surgery. (Tr. 35, 38-39, 44-46.) She has been hospitalized on many occasions for various illnesses, but most frequently for bronchitis.  (Tr. 44-46.)  She gets bronchitis at least once per month, lasting for one to two weeks.  (Tr. 63.)

- She also suffers from mental health problems.  She has been diagnosed with mood disorder and "traces of bipolar."  (Tr. 41.)  She described herself as "very, very withdrawn."  (*Id.*)  Since her onset date in 2006, she admitted herself for emergency care for a "nervous breakdown" and "thoughts of suicide."  (*Id.*)

- Her mental health symptoms include feeling "very, very depressed" and unable to get out of bed.  (Tr. 42.)  She has difficulty coping with the stress

14

of caring for her children and feels "drained."  (*Id*.)  New situations and crowds "agitate" her.  (Tr. 54-55.)

- She sees a psychiatrist once per month, and a therapist twice per month. (Tr. 41.)  In addition, she takes a number of medications for her mental impairments, including Tipterol [phonetic], Effexor, Wellbutrin, and Clozapine [phonetic].  (Tr. 41-42.)  Her medications have helped "somewhat."  (Tr. 42.)

- Because of her impairments, she can no longer play sports or swim.  (Tr. 43.)  She has difficulty breathing during the summer months.  (*Id*.)  Her father shops for her childrens' clothing, and her oldest children help with household chores.  (Tr. 54, 58.)  She goes to the grocery store, although sometimes she becomes "agitated' by the people in the store.  (Tr. 55.) She uses the computer "a little bit" and plays card games with her children.  (Tr. 56-57.)  She sometimes reads books and watches television.  (Tr. 58.) She has three or four friends, with whom she visits approximately once per month.  (Tr. 55-56.)

- She has previous work experience as a cook, an STNA, a school bus aide, and a sales person.  (Tr. 33.)  However, she could never keep a job for more than three or four months due to illness, stress, or medical appointments.  (Tr. 34.)

- She worked as a school bus aide from August 2006 to January 2007.  (Tr. 59-60.)  As part of this job, she worked for approximately two hours per day assisting special needs children with getting on and off the bus.  (Tr. 60-61.)  She does not think she could perform this job any longer because of her back and hip pain.  (*Id*.)

- She last worked as a sales person, from May through September 2007. (Tr. 46-49.)  She sold cleaning systems through home demonstrations by appointment.  (Tr. 46-47.)  She worked, at most, for three to six hours per day, and was paid on commission.  (Tr. 47.) She stopped working at this job because she broke her ankle, and then decided not to return because of problems with her asthma.  (Tr. 48-49.)  She thinks she would no longer be able to perform this job because she has problems dealing with people and "little things agitate and irritate her."  (Tr. 52.)

**b.    March 18, 2014 Hearing**

During the March 18, 2014 hearing, Plaintiff testified to the following:

- She obtained her GED in June 2011.  (Tr. 1030.)  It took her four to five years to get her GED because of her recurrent illnesses and medical

15

appointments.  (Tr.  1029-1030.)  She also attended community college for two and one half years, where she studied nursing.  (Tr. 1021-1022.)  She initially attended college full-time, but then went to a part-time schedule because of her frequent medical procedures, surgeries, and illnesses. (*Id.*)

- Her mental health issues began when she was fourteen to fifteen years old.  (Tr. 1024.)  At that time, she had a "breakdown" and was hospitalized for two days.  (*Id.*)  She thereafter received mental health treatment, including therapy, medication, and anger management classes.  (Tr. 1024-1025.)  In addition, she admitted herself to the hospital approximately two years ago because of suicidal thoughts.  (Tr. 1026.)

- She currently sees a counselor twice per month, and a psychiatrist every two months.  (Tr. 1026.)  She has been taking medication for the past ten years, which helps "a little bit."  (*Id.*)

- She described her mental health symptoms as follows.  She becomes very agitated and withdrawn.  (Tr. 1027.)  She cannot cope with crowds. (*Id.*)  She becomes very anxious and "blows up" when confronted with stressful situations.  (*Id.*)  "New situations" and "situations that aren't controlled" cause her stress.  (Tr. 1034.)  She becomes upset when "things don't go the way they're supposed to," or when people don't do what they are supposed to do.  (*Id.*)

- She has a host of physical impairments, including "female issues" such as hemorrhaging, blood clots, and cysts; arthritis in her spine, lower back, hips, and knees; acute bronchitis; asthma; migraines; and kidney stones. (Tr. 1030-1032, 1035.)  In the past eight years, she has been hospitalized for her lungs, back, gallbladder, rectal bleeding, polyps, ulcers, hemorrhaging, colitis, infections, bronchitis, pneumonia, and blood clots. (Tr. 1033.)  She has "probably spent more time in the hospital than . . . at home." (*Id.*)

- Since her alleged onset date of January 2006, there has never been a time when she did not have numerous medical visits.  (Tr. 1032-1033.) She generally has three to four medical visits per month.  (*Id.*)  She explained that "[t]here is never a month that I don't have multiple doctors' appointments for myself."  (Tr. 1037.)  She is not able to schedule these appointments on weekends or after hours.  (*Id.*)

- Her last job was in 2007 to 2008, when she worked in sales.  (Tr. 1028.) She was unable to continue in this job because of her bronchitis, pneumonia, back pain, and mental health symptoms (including anxiety attacks, "breakdowns," and crying).  (Tr. 1028.)

16

### 2.    Medical Expert's Testimony

There was no ME testimony at the April 2011 hearing.  During the March 2014 hearing, however, clinical psychologist Joseph Steiner, Ph.D., testified as an ME regarding Plaintiff's mental impairments and functional limitations.  (Tr. 1037-1063.)

Dr. Steiner first testified that he had not examined Plaintiff but, rather, had reviewed her medical records and listened to her hearing testimony.  (Tr. 1038, 1058.) He stated Plaintiff's "main issue" appeared to be depression, although he noted diagnoses in the record of mood disorder, bipolar disorder, anxiety disorder, adjustment disorder, dystonic disorder, personality disorder, and impulse control disorder.  (Tr. 1039.)

Dr. Steiner testified that, in the area of activities of daily living, Plaintiff was mildly impaired.  (Tr. 1039.)  He found she was moderately impaired in the areas of social functioning and concentration, persistence, and pace.  (Tr. 1039-1040.)  Dr. Steiner stated that Plaintiff had no episodes of decompensation of an extended duration.  (Tr. 1040.)  He expressly testified that Plaintiff's mental impairments did not meet or equal the requirements of the listings.  (*Id.*)

The ALJ then questioned Dr. Steiner regarding Plaintiff's mental health limitations, as follows:

> Q:    What mental health limitations would the claimant have due to her mental impairments?
>
> A:    Okay for work, work would have to be static with few changes, or the changes clearly explained.  A low stress environment.  Reduced contact with the public.  And no more responsibility for planning other than that specific days' work, not bound to the future.

Q:      No responsibility for extended planning?

A:      Correct.

Q:      Okay, I would like to summarize this, Dr. Steiner.  On a mental health
        basis, would the claimant be capable of performing simple, routine
        tasks in a low stress setting?

A:      Yes, your Honor.

Q:      And by low stress, I mean no fast paced, strict quotas or frequent
        duty changes involving superficial interpersonal interactions without
        the need for extended planning?

A:      Correct.

(Tr.  1040-1041.)

On examination by Plaintiff's attorney, Dr. Steiner further testified that Plaintiff's

symptoms were not severe enough to satisfy the Paragraph C criteria for Listing 12.04.

(Tr. 1044.)  In support of this assertion, Dr. Steiner noted that several exhibits in the

record indicated Plaintiff was in "full remission."  (Tr. 1044-1045.)  He also stated that,

based on his review of the medical record, he believed Plaintiff "continuously got better

during the eight year period" since her alleged onset date.  (Tr. 1046-1048.)

On further questioning from Plaintiff's counsel, Dr. Steiner clarified that Plaintiff

cannot supervise other employees and cannot have "consistent attention" or be micro-

managed.  (Tr. 1055-1056.)  He stated that she can work in close proximity to others

and can generally react appropriately to supervision as long as it is not "overly critical."

(Tr. 1056-1057.)  Dr. Steiner acknowledged, however, that he could not predict whether

Plaintiff could "handle ordinary supervision including criticism on a sustained basis 40

hours a week, 52 weeks a year."  (*Id.*)

Finally, Dr. Steiner stated his testimony was based on "everything in the file and

18

[Plaintiff's] testimony."  (Tr. 1058.)  Plaintiff's counsel expressed concerns that Dr.

Steiner had improperly weighed Plaintiff's credibility in formulating his opinions.  (Tr.

1058-1059.)  The ALJ stated that "[i]t is not for the medical expert to make credibility

determinations, that is my responsibility."  (Tr. 1058.)  The ALJ then questioned Dr.

Steiner as follows:

> Q:   Dr. Steiner, are you judging the claimant's credibility or are you
>      reviewing the entire record including the testimony and objective
>      medical and clinical findings in the documentary evidence?
>
> ME:  I am reviewing the entire file and testimony.
>
> Q:   Are you assessing credibility or do you recognize that it's my
>      responsibility?
>
> ME:  I recognize it's your responsibility.

(Tr. 1059-1060.)

### 3.   Vocational Expert's Testimony

During the April 2011 hearing, the ALJ posed the following hypothetical to the

VE:

> I want you to consider a hypothetical individual age 29 with a limited
> education.  I'd like you to further assume that this hypothetical individual
> I'm describing would be able to lift and/or carry 20 pounds occasionally, 10
> pounds frequently; stand and/or walk for six hours of an eight-hour day; sit
> for about six hours of an eight-hour day; would be occasionally able to
> climb, but no ladders, ropes, or scaffolds; would be occasionally able to
> stoop; would need to avoid work environments of extreme heat; would
> need to avoid work environments with smoke, fumes, dust, gases; would
> be able to understand, remember, and carry out non-detailed two to three
> step instructions; where interaction in a routine work environment with few
> daily changes, where interaction with coworkers would be superficial in
> nature, and interaction with the general public would be no more than
> occasional.

(Tr. 65-66.)  The VE testified such a hypothetical individual would be able to perform

19

representative jobs in the national economy such as mail clerk (light, unskilled, SVP 2) and bench assembler (light, unskilled, SVP 2).  (Tr. 66-67.)

Plaintiff's counsel then asked the VE "how much absenteeism could a new worker have and expect to be kept on in these jobs?"  (Tr. 67.)  The VE testified that "the average is six to eight times per year, meaning less than one time per month." (*Id.*)

On remand, during the March 2014 hearing, the ALJ first found Plaintiff had no vocational relevant work experience due to the "very limited earnings in this case."  (Tr. 1065.)  The ALJ then posed the following hypothetical to the VE:

> I would like you to assume an individual who at the time of the date last insured was 25 and she is now 32.  She has a GED and has gone to college for a couple of years at the community college, so I find that she can read and write and perform simple arithmetic.  Again, no vocational work background.  This individual is capable of performing work of light exertional requirements, but she has additional exertional limitations.  Specifically, no climbing of ladders, ropes, or scaffolds.  Occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  No concentrated exposure to temperature extremes, humidity, or environmental pollutants. And mental limitations that she perform simple, routine tasks in a low stress setting. Specifically, no fast paced strict quotas, or frequent duty changes.  With superficial interpersonal interactions which I define to include no arbitration, negotiation, or confrontation.  No require [sic] for extended planning of work duties or supervising others, or micro management. * * *  Are there jobs existing in significant numbers in the economy that this individual could perform?

(Tr. 1065-1066.)  The VE testified such a hypothetical individual could perform the representative jobs of housekeeper (light, unskilled, SVP 2); sales attendant (light, unskilled, SVP 2); and dining room attendant (light, unskilled, SVP 2).

The ALJ then posed a second hypothetical that was the same as the first, but added the limitation that the individual would be off task at least 20 percent of the time. (Tr. 1067.)  The VE testified there would be no jobs existing in significant numbers in the

20

economy for such an individual.  (Tr. 1067-1068.)  Plaintiff's attorney then asked the VE

the following questions regarding the issues of absenteeism and time spent off task;

Q:   Mr. Salkin, the last hypothetical [was] off task 20 percent, what if it were off 10 to 15 percent?

A:   Same answer: no jobs.

Q:   How about 10 percent?

A:   Yes, jobs cited can be performed.  I would note that the general response for occupations, jobs do vary in that.  My profession[al] experience, not of course in the DOT.

Q:   And the occupations you named, during the training period, if the person were off task 10 percent of the time, would that be a problem?

A:   No.

Q:   What's the general standard for absenteeism, tardiness, and leaving early for occupations like the three that you mentioned?

A:   National absentee rates are 3 to 5 percent that equates to half a day to one day per month listed by the Bureau of Labor Statistics.  I cannot find an empirical standard for tardiness or early outs.  I am not sure they are counted as a full absence so I am not sure how to answer that question.

Q:   Okay, is there a higher standard for attendance during the training period, or probationary period of these types of un-skilled jobs?

A:   Well I think on performance, no.  I think on employability, yes.

Q:   So when you say employability, employers would have problems with a person even missing one day a month at the beginning?

A:   Yes. * * * That's actually the same number after the first month, I said 3 to 5 percent half day, to one day a month.  So I am giving you the same answer for the probationary period as I am beyond that.

Q:   All right, would it matter if those – the absentee days were for medical treatment or emergencies?

21

> A:    No.  We are talking about the performance of jobs, not the
>       employer's perception of absence.

(Tr. 1068-1070.)

## III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and*

22

416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§

404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant, Chrystal N. Williams, was insured for a period of disability and disability insurance benefits on the January 1, 2006 onset date, and she remained insured for these benefits through September 30, 2007.

2.   The claimant has not engaged in disqualifying substantial gainful activity at any time since the January 1, 2006 alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3.   The "severe" impairments the claimant has had since the January 1, 2006 alleged onset date are best described as follows: asthma, degenerative disc disease of the lumbar spine, obesity, an affective disorder, an anxiety-related disorder, and a personality disorder.  At various times since January 1, 2006, the claimant has also been treated for headaches, kidney stones, vaginal bleeding, and a pulmonary condition.  (20 CFR 404.1520(c) and 416.920(c)).

4.   Since the January 1, 2006 alleged onset date, the claimant has not had an impairment or a combination of impairments, that has met or medically equaled the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   Since the January 1, 2006 alleged onset date, and with the exception of possible briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity (20 CFR 404.1545, 404.1567, 416.945 and 416.967) to perform all the basic work activities described in 20 CFR 404.1521, 404.1545, 416.921 and 416.945 subject to the following limitations/restrictions: she can

23

lift/carry up to 10 pounds frequently and up to 20 pounds occasionally; and she can sit with normal breaks for about six hours in an eight-hour period; and she can stand/walk with normal breaks for about six hours in an eight-hour period; and she can occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; and she can perform simple, routine tasks in a low stress setting (that is work that does not have to be performed at a fast pace, or work that is subject to strict quotas, or work that involves frequent duty changes) where she would have no more than superficial interpersonal interactions, and where she would not have to engage in extended planning (that is planning for work on a different day), and where she would not have to engage in arbitration with others, and where she would not have to negotiate with others, and where she would not have to confront others, and where she would not have to supervise and/or micromanage others.  In addition, the claimant has not been able to climb ladders, ropes or scaffolds or work in environments where she would have concentrated exposure to temperature extremes, humidity or environmental pollutants (20 CFR 404.1569a and 416.969a).

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant has been considered to be a younger individual in the "18 to 49" age group ever since the January 1, 2006 alleged onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a high school education by virtue of having earned a general equivalency diploma, and she is able to communicate in English. (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant has no past relevant work (20 CFR 404.1568 and 416.968).

10.  Having considered the claimant's age, education, work experience, and residual functional capacity, the undersigned concludes that there are a significant number of the [sic] jobs in the economy that the claimant has been able to perform since the January 1, 2006 alleged onset date (20 CFR 404.1569(a), 416.969 and 416.969a).

11.  The claimant, Chrystal N. Williams, has not been under a disability, as defined in the Social Security Act, at any time between the January 1, 2006 alleged onset date and the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

24

## V.  LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.  Plaintiff's Assignments of Error

#### 1.  Evaluation of Opinions of Treating Physician Dr. Rao

25

In her first assignment of error, Plaintiff argues the ALJ failed to properly evaluate the April 2011 opinion of her treating psychiatrist, Dr. Rao, that Plaintiff had "marked" limitations in her abilities to keep a regular work schedule and withstand the stresses of routine, simple, unskilled work.  (Doc. No. 16 at 17.)  Plaintiff asserts the ALJ failed to reconcile Dr. Rao's opinion that Plaintiff cannot work on a sustained basis with the VE's testimony that absenteeism of more than one day per month would be unacceptable. Plaintiff further asserts the ALJ failed to note the abnormal clinical findings and prescribed medications that supported Dr. Rao's opinion, and ignored the frequency of mental and medical treatment that allegedly supports Dr. Rao's opinion that Plaintiff cannot maintain a regular schedule.

The Commissioner maintains the ALJ reasonably afforded little weight to Dr. Rao's opinion and "sufficiently articulated his reason for doing so."  (Doc. No. 20 at 11.) She notes the ALJ referenced numerous exhibits throughout the record in support of his conclusion that Dr. Rao's opinions were not supported by the evidence.  The Commissioner claims that "the records cited by the ALJ reflect no more than moderate symptomatology throughout the period at issue, and actually support ongoing improvement in Plaintiff's psychological symptoms."  (*Id.*)

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.' " *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so

26

that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

"The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002), citing *Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985).  Furthermore, it is well-established that administrative law judges may not make medical judgments.  *See Meece v. Barnhart,* 192 Fed. App'x 456, 465 (6th Cir. 2006) ("But judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.") (quoting *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990)).  Although an ALJ may not substitute his or her opinions for that of a physician, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); see also *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp.2d 807, 823-24 (N.D. Ohio 2009) (O'Malley, J.) ("Although the ALJ is charged with making credibility determinations, an

ALJ 'does not have the expertise to make medical judgments.'")

Here, the ALJ discussed the medical evidence regarding Plaintiff's mental impairments, noting in particular that (1) Plaintiff reported to her psychiatrist that she was doing well throughout 2006 and 2007; (2) she was assessed a GAF of 55 (indicating moderate symptoms) in both January 2008 and August 2011; (3) she was not psychiatrically hospitalized at any time since March 2006; (4) she had been able to interact adequately with others on numerous occasions since her onset date; (5) she had been described as alert and properly oriented and/or as having good concentration abilities on numerous occasions; (6) she did not exhibit any marked or extreme problems during her hearing before the ALJ; and, (7) she was able to carry out most activities of daily living without assistance, work, and attend college since her onset date.  (Tr. 985-987.)

The ALJ then assessed the opinion evidence, first ascribing "great weight" to the opinion of medical expert Dr. Steiner.  (Tr. 987.)  The ALJ then evaluated Dr. Rao's opinions as follows:

> In contrast to the great weight the undersigned has given to Dr. Steiner's opinions regarding the claimant's mental residual functional capacity, the undersigned has given less weight to the opinions about the claimant's mental residual functional capacity that were offered on April 20, 2011 by the above-mentioned treating psychiatrist (see Ex. 34F, pps. 2 and 3). More specifically, the undersigned does not find that the evidence as a whole, including the evidence cited to in this decision, supports this source's opinion that the claimant would be 'unable to keep a regular work schedule on a sustained basis' (*see* Ex. 34F, p. 2), and his opinion that the claimant was markedly limited in terms of her ability to interact with others (*see* Ex. 34F, p. 2), and with his opinion that it would be difficult for the claimant "to work on a sustained basis in any job situation" (*see* Ex. 34F, p. 3), and with his opinion that the claimant was markedly limited in terms of her ability to make simple work-related decisions.'  If this source were correct, the undersigned would not expect that the claimant would be

able to be a single parent to four minor children, work at substantial gainful activity levels, and attend college full-time.

In summary, the undersigned concludes that the most restrictive statements that have been made about the claimant's functioning since the January 1, 2006 alleged onset date are disproportionate with and not supported by the medical and nonmedical evidence in the record.

(Tr. 987.)[9]

With regard to her mental impairments, the RFC limited Plaintiff to "simple, routine tasks in a low stress setting (that is work that does not have to be performed at a fast pace, or work that is subject to strict quotas, or work that involves frequent duty changes) where she would have no more than superficial interpersonal interactions, and where she would not have to engage in extended planning (that is planning for work on a different day), and where she would not have to engage in arbitration with others, and where she would not have to negotiate with others, and where she would not have to confront others, and where she would not have to supervise and/or micromanage others."  (Tr. 981.)

Reading the decision as a whole, the Court finds the ALJ sufficiently articulated "good reasons" for according "less weight" to Dr. Rao's opinions that Plaintiff is markedly limited in her abilities to keep a regular work schedule and withstand the stresses of routine, simple, unskilled work.  In rejecting these opinions, the ALJ

---

[9]  Additionally, at step three, the ALJ rejected the argument that Dr. Rao's opinions supported a finding that Plaintiff' s affective and/or anxiety disorders met or equaled a listing, finding that "[Dr. Rao's] most extreme opinions are not supported by the record . . . and . . . are not consistent with the other medical source opinions of record that touch on these points (see Exs. 7F, p 8 [Dr. Smith]; 9F, p 11 [Dr. Demuth] and 18F [Dr. Matyi]; and the testimony of Dr. Steiner at the March 18, 2014 hearing)."  (Tr. 981.)

determined that the evidence cited previously in the decision failed to support Dr. Rao's opinions of marked limitations in mental functioning.  (Tr. 987.)  As noted above, prior to weighing the opinion evidence, the ALJ discussed the medical evidence regarding Plaintiff's mental impairments at length, citing numerous exhibits throughout the record that demonstrated mild to moderate symptoms and overall improvement with treatment. (Tr. 985-987.)

For example, the ALJ emphasized Dr. Lee's treatment notes in 2006 and 2007 that consistently described Plaintiff as happy, pleasant, and "doing well" with "no complaints" while taking her medication.  (Tr. 986 citing "Ex. 5F," i.e., Tr. 392-399.)  The decision also correctly pointed out that Plaintiff was assessed a GAF of 55, indicating moderate symptoms, in both January 2008 (by Dr. Smith) and August 2011 (by Dr. Majahan).  (Tr. 986.)  The ALJ further noted that Plaintiff frequently presented to practitioners as alert, oriented, and cooperative with a calm and/or normal affect and no overtly depressive or other psychological symptoms.  (Tr. 985-986 citing numerous exhibits, including those located at Tr. 338, 347, 356, 444, 531, 750, 755, 757, 771, 792, 799, 816, 830, 847, 922, 925, 939, 1270, 1273, 1277, 1280, 1290.)[10]  The ALJ also referenced several treatment notes indicating improvement, including (1) a July 2008 treatment note from Dr. Rao indicating Plaintiff was less depressed and showing moderate improvement; and (2) October 2010 progress notes from counselors at the Nord Center stating Plaintiff was in a "good mood," "more animated and pleasant,"

_____

[10] Although the Court appreciates the ALJ's use of pinpoint citations, the decision's reliance on string citations to numerous exhibits in the record, often without further analysis, makes it extremely difficult for the Court to conduct its review.

"feeling less irritable," and "showing moderate improvement." (Tr. 986 citing Tr. 510, 922, 925.)  The ALJ also referenced Dr. Davin's February 2012 psychological pain management evaluation, which noted Plaintiff's DASS scores suggesting mild depression and anxiety.  (Tr. 985-986 citing Tr. 1386-1388.)  Additionally, the ALJ emphasized numerous records describing Plaintiff as able to perform most activities of daily living without assistance and attend college classes.[11]  (Tr. 986 citing Tr. 256, 634, 929, 1363.)  Finally, the ALJ emphasized that he did not detect marked or extreme problems with Plaintiff's social functioning or concentration during the March 2014 hearing.  (Tr. 986.)

Citing generally to the "fact section" of her Brief, Plaintiff asserts the ALJ "failed to note all the abnormal clinical findings and prescribed medications that supported Dr. Rao's opinion."[12]  (Doc. No. 16 at 18.)  While the record does show that Plaintiff suffered

---

[11] While the record does reflect that Plaintiff attended college courses in 2011 and 2012, it is not clear that she did so on a full-time basis throughout this entire time period.  Moreover, while Plaintiff reported some work since her onset date, her work attempts lasted no more than several months due (according to Plaintiff) to her medical problems and/or her frequent absences relating to medical appointments.  (Tr.  162, 208-210.)  Thus, the Court questions the ALJ's reliance on Plaintiff's alleged ability to work and attend full-time college classes as a basis to reject Dr. Rao's opinions.  As noted above, however, the ALJ did not rely solely on these reasons and, instead, expressly referenced medical evidence demonstrating moderate symptoms and gradual improvement over time.

[12] Plaintiff also complains generally (and without assigning it as error) that the ALJ failed to address "the frequency of mental and medical treatment which supported Dr. Rao's opinion that Williams could not keep a regular schedule." (Doc. No. 16 at 18.)  Dr. Rao's opinions in this regard, however, were not based on the alleged frequency of her medical appointments but, rather, on his view of the severity of her mental health symptoms, which the ALJ did address in the decision.  Moreover, Plaintiff does not direct this Court's attention to any physician opinion that expressly finds that Plaintiff would be expected to regularly

31

periodic exacerbations of her mental health symptoms, the evidence falls short of establishing that the ALJ's rejection of Dr. Rao's opinions of marked limitations was not supported by substantial evidence.  Viewed as a whole, the record shows gradual improvement with treatment, leading several physicians (i.e., Drs. Smith, Davin, and Majahan) to assess Plaintiff with mild to moderate symptoms.  (Tr. 413, 1290-1291, 1387.)  Moreover, the ALJ did acknowledge the fact that Plaintiff was prescribed medication for her mental health symptoms, noting that he had "taken into consideration that significant medications side effects are not mentioned in the claimant's medical chart over any sustained period since the January 1, 2006 alleged onset date."  (Tr. 987.)

Finally, Plaintiff does not adequately explain in what respect the RFC fails to accommodate her mental health symptoms.  As noted above, the RFC expressly limits Plaintiff to "simple, routine tasks in a low stress setting," with no fast pace work, strict quotas, and no frequent duty changes, extended planning, arbitration, negotiation, or supervisory responsibilities.  (Tr. 981.)  The RFC also limited Plaintiff to no more than "superficial interpersonal interactions."  (*Id.*) Plaintiff does not articulate any specific, additional restrictions that she believes should have been included in the RFC based on

---

miss more than one day of work per month as a direct result of her medical appointments or treatment.  Although Plaintiff states that "the record shows more than two [medical visits] per month starting in 2007 and continuing through 2013," (Doc. No. 16 at 3), the Court finds this to be insufficient, in and of itself, to conclusively establish work-preclusive absenteeism. The fact that Plaintiff has had two medical visits per month in the past does not mean that she will necessarily continue to have the same frequency of medical visits in future. Moreover, Plaintiff has not established (or alleged) that these medical visits would have regularly caused her to miss an entire day of work.

Dr. Rao's opinions of marked limitations.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ sufficiently articulated "good reasons" for rejecting Dr. Rao's opinions of marked limitations and, further, that those reasons are supported by substantial evidence in the record.[13]  Plaintiff's first assignment of error is without merit.

### 2.  Evaluation of Opinion of Consultative Examiner Dr. Smith

Plaintiff next argues the ALJ failed to properly evaluate the opinion of consultative examiner Dr. Smith that Plaintiff was moderately limited in her ability to withstand the stress and pressure of day-to-day work activity.  (Doc. No. 16 at 22.) Specifically, Plaintiff asserts that "the decision failed to weigh Dr. Smith's opinion, mentioning only that the opinions offered by 'a consulting psychologist,' exhibit 7F, were 'less restrictive' than" Dr. Rao's.  (*Id.* at 23.)  Plaintiff further maintains, without explanation, that "[n]one of the mental limitations in the ALJ's RFC finding or the hypothetical question addressed a moderate limitation in withstanding the stress and pressure of 'day-to-day work activity.'" (*Id.*)

The Commissioner argues that the ALJ properly considered and discussed Dr. Smith's opinion in the decision.  (Doc. No. 20 at 17.)  She asserts, however, that "to the

---

[13]  The Court has some concern regarding the fact that Dr. Rao's treatment notes are largely illegible.  While the Court was able to decipher many words and phrases, large portions of Dr. Rao's notes are simply impossible to read. There may be information helpful to Plaintiff's case buried in these notes. Plaintiff chose not to have Dr. Rao's notes transcribed, however, nor did she otherwise provide assistance to the Court in deciphering or quoting these documents.  In the end, it is Plaintiff's burden of demonstrating an entitlement to disability benefits by proving the existence of a disability.  *See e.g,. Ervin v. Comm'r of Soc. Sec.*, 2012 WL 3150965 at * 6 (N.D. Ohio Aug. 2, 2012) (McHargh, M.J.).

extent that the ALJ did not explicitly weigh Dr. Smith's functional assessments, such oversight should be considered harmless in this case" because the RFC was "not inconsistent with Dr. Smith's assessments." (*Id.*)  Indeed, the Commissioner argues that "the ALJ crafted an RFC that was actually more restrictive than Dr. Smith's assessments" and "Plaintiff has not shown how Dr. Smith's assessments warrant any limitation not already accommodated in the RFC." (*Id.* at 18.)

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i).  Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions.  (*Id.*)  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  (*Id.*)

Here, the ALJ did not expressly articulate the weight ascribed to Dr. Smith's opinion.  The decision expressly refers to Dr. Smith's evaluation ("Exhibit 7F" of the administrative record) on several occasions, however, in the discussion of both the

34

medical evidence and the opinion evidence.  (Tr. 985-987.)  In weighing the opinion evidence, the ALJ states that the opinions of Dr. Steiner (to which the ALJ accorded "great weight") "also encompass the less restrictive opinions offered by the above-mentioned state agency psychologists who reviewed the record (see Exhs. 8F, p3; and 18F) [i.e., Dr. Demuth and Dr. Matyi], and by a consulting psychologist who evaluated the claimant on January 14, 2008 at the request of the Commissioner (see Ex. 7F, p.8) [i.e., Dr. Smith]."  (Tr. 987.)

Although the ALJ could have provided a more thorough discussion of Dr. Smith's opinions, the Court agrees that the failure to do so was harmless under the circumstances.  As noted above, the RFC contains extensive mental limitations, restricting Plaintiff to "simple, routine tasks in a low stress setting" with strict quotas, and no fast pace work, frequent duty changes, extended planning, arbitration, negotiation, or supervisory responsibilities.  (Tr. 981.)  Plaintiff does not explain how the RFC's mental limitations fail to incorporate Dr. Smith's opinion that Plaintiff is moderately limited in her ability to withstand the stress and pressure of day-to-day work activity.[14]  Nor does Plaintiff articulate any specific additional limitations that she believes should have been included in the RFC based on Dr. Smith's opinion of moderate limitations in withstanding stress.

---

[14]Plaintiff asserts, summarily, that "[a] moderate impairment of the ability to withstand the stress and pressure of day-to-day work activity is inconsistent with missing at most one day per month, the standard for sustained work set by the vocational expert in this case." (Doc. No. 22 at 6.) Plaintiff cites no legal authority for this position, nor does she provide any reasoned explanation to support a finding that a "moderate" impairment in the ability to withstand stress is necessarily work preclusive.

While the ALJ did not adopt the exact language of Dr. Smith's opinion, the Court finds that the limitations in the RFC address Dr. Smtih's concerns regarding Plaintiff's ability to withstand the stress and pressures of day-to-day work activity.  *See Divens v. Astrue*, 2012 WL 220246 at * 11 (S.D. Ohio Jan. 25, 2012) ("There is no requirement that the ALJ adopt the precise language offered by a medical source, as long as the ALJ's conclusion is supported by substantial evidence.")  The ALJ's failure to more specifically address Dr. Smith's opinion was, therefore, harmless.

Plaintiff's second assignment of error is without merit.

### 3.    Evaluation of Opinion of Medical Expert Dr. Steiner

In her third assignment of error, Plaintiff argues the ALJ erred in according "great weight" to the opinions of the testifying medical expert, Dr. Steiner.  (Doc. No. 16 at 23-25.)  She asserts "the ALJ obtained changes in the witness' testimony that render the testimony unreliable," and maintains "the testimony was tainted by the logical impossibility of the psychologist rejecting claimant's testimony, admitting he considered that testimony yet denying that he made any credibility judgment about applicant's testimony when instructed by the ALJ."  (*Id.* at 24.)  Plaintiff complains "the ALJ allowed and encouraged inconsistencies in the testimony of the non-examining psychologist, while discounting the opinion of the long-term treating psychiatrist with generalities and exaggerations of daily activities."  (*Id.*)  Finally, Plaintiff asserts Dr. Steiner's testimony was "infected with error," because he testified that Dr. Rao found Plaintiff's symptoms to be in "full remission" when, in fact, the parties agree Dr. Rao found her symptoms to be only in "fair remission."  (Doc. No. 22 at 7.)

The Commissioner asserts that the ALJ reasonably afforded great weight to Dr.

36

Steiner's opinion.  (Doc. No. 20 at 14.)  She maintains the ALJ gave several reasons for

crediting Dr. Steiner's opinion over Dr. Rao's, including that (1) Dr. Steiner was the only

medical source who had the opportunity to review the entire record, and (2) Dr.

Steiner's opinion was consistent with the record as a whole, including the findings of

Drs. Smith, Demuth, and Matyi.  Finally, the Commissioner argues that a careful review

of the hearing transcript demonstrates Dr. Steiner did not provide inconsistent opinions

and was not unduly pressured by the ALJ.

During the March 2014 hearing, Dr. Steiner testified Plaintiff could perform work

activities under the following conditions: "work would have to be static with few changes

or the changes clearly explained.  A low stress environment.  Reduced contact with the

public.  And no more responsibility for planning other than that specific days' work, not

bound to the future."  (Tr. 1040.)  The ALJ then questioned Dr. Steiner as follows:

> Q:    Okay, I would like to summarize this, Dr. Steiner.  On a mental
>        health basis, would the claimant be capable of performing simple,
>        routine tasks in a low stress setting?
>
> A:    Yes, your Honor.
>
> Q:    And by low stress, I mean no fast paced, strict quotas or frequent
>        duty changes involving superficial interpersonal interactions without
>        the need for extended planning?
>
> A:    Correct.

(Tr.  1040-1041.)  Later, Dr. Steiner testified further that Plaintiff could not supervise

others or have any "consistent attention, like micro-managing of her."  (Tr. 1056.)  He

stated Plaintiff was "capable of handling authority as long as it's not micro managing

and overly critical."  (Tr. 1057.)  When pressed, Dr. Steiner acknowledged he could not

honestly predict whether Plaintiff could handle ordinary supervision (including criticism)

on a sustained basis; i.e., 40 hours per week, 52 weeks a year.  (*Id.*)

On cross-examination, Dr. Steiner testified his opinions were supported by the fact that Plaintiff "continuously got better during the eight year period" since her alleged onset date.  (Tr. 1047.)  He acknowledged Plaintiff was "worse before she was ever treated, and when she is off medication," but reiterated that, from the beginning of 2006 to the date of the hearing, her condition "seem[ed] to be continuously improving."  (Tr. 1048.)  Dr. Steiner specifically referenced one of Dr. Rao's treatment notes which he interpreted as stating that Plaintiff was in "full remission" (Tr. 1335), as well as a series of Nord Center treatment notes spanning the time period July 2010 to January 2011 (Tr. 914-930.)  (Tr. 1044.)

Finally, Dr. Steiner stated his testimony was based on "everything in the file and [Plaintiff's] testimony."  (Tr. 1058.)  When Plaintiff's counsel expressed concerns that Dr. Steiner had improperly weighed Plaintiff's credibility in formulating his opinions, the ALJ stated that "[i]t is not for the medical expert to make credibility determinations, that is my responsibility."  (Tr. 1058-1059.)  The ALJ then questioned Dr. Steiner as follows:

> Q:   Dr. Steiner, are you judging the claimant's credibility or are you reviewing the entire record including the testimony and objective medical and clinical findings in the documentary evidence?
>
> ME:  I am reviewing the entire file and testimony.
>
> Q:   Are you assessing credibility or do you recognize that it's my responsibility?
>
> ME:  I recognize it's your responsibility.

(Tr. 1059-1060.)

In the decision, the ALJ addressed Dr. Steiner's opinion as follows:

The mental residual functional capacity the undersigned has assigned for the claimant is supported in full by the opinion of Dr. Steiner. The undersigned gives great weight to Dr. Steiner's opinions because he was the only medical source who had the opportunity to review the entire documentary record and hear the claimant testify. Dr. Steiner was also able to expound on the reasons in support of his opinions regarding the claimant's mental residual functional capacity. Dr. Steiner's opinions were also subject to cross-examination. Dr. Steiner's opinions are also supported by the record including the evidence that has been cited to in this decision. Dr. Steiner's opinions also encompass the less restrictive opinions offered by the above-mentioned State agency psychologists who reviewed the record (see Exs. 8F, p. 3 [Dr. Demuth] and 18 F [Dr. Matyi]); and by a consulting psychologist who evaluated the claimant on January 14, 2008 at the request of the Commissioner (see Ex. 7F, p. 8) [Dr. Smith].

(Tr. 987.)

As an initial matter, the Court finds the ALJ did not "unduly pressure" Dr. Steiner during the hearing or "obtain changes" to his testimony regarding Plaintiff's mental limitations that render his opinions unreliable. After hearing Dr. Steiner's specific opinions regarding Plaintiff's mental limitations, the ALJ simply followed-up to confirm that his summary of Dr. Steiner's testimony accurately reflected Dr. Steiner's opinions. Dr. Steiner confirmed that the ALJ accurately summarized his opinions on at least two separate occasions during the hearing. (Tr. 1040-1041, 1049.) If Dr. Steiner disagreed with the ALJ's summary of his opinions, he had ample opportunity to say so. He did not, and there is absolutely nothing in the record to suggest that he was "pressured" in any way.

The Court also rejects Plaintiff's argument that there are "inconsistencies" in Dr. Steiner's testimony regarding Plaintiff's mental limitations. First of all, Plaintiff fails to specify the alleged inconsistencies in Dr. Steiner's testimony in this regard. To the extent Plaintiff is alleging Dr. Steiner's testimony is "inconsistent" with the RFC, the

Court rejects this argument.  Dr. Steiner testified Plaintiff was limited to a low stress work environment with few changes clearly explained, reduced contact with the public, no responsibility for extended planning, and no supervision.  Plaintiff fails to articulate how this testimony is inconsistent with the mental limitations set forth in the RFC.[15]

To the extent Plaintiff is arguing that Dr. Steiner's testimony is inconsistent with regard to his reliance on Plaintiff's hearing testimony, the Court rejects this argument as well.  Dr. Steiner testified that he relied on the record as a whole and Plaintiff's testimony during the hearing.  The ALJ expressly thoroughly and clearly explained that "[i]t is not for the medical expert to make credibility determinations, that is my responsibility."  (Tr. 1058-1059.)  The ALJ expressly confirmed with Dr. Steiner that he (Dr. Steiner) was not assessing Plaintiff's credibility in rendering his opinions regarding her mental limitations.  (Tr. 1059-1060.)  The Court finds no error in this regard.

Finally, the Court finds the ALJ did not err in according "great weight" to Dr. Steiner's opinions.  The ALJ provided several reasons for crediting Dr. Steiner's opinions over those of Dr. Rao, including (1) the fact that Dr. Steiner had the opportunity to review the entire medical record and (2) the overall consistency of Dr. Steiner's opinions with the medical record and the opinions of state agency physicians Drs.

---

[15] Plaintiff suggests in her Reply Brief that Dr. Steiner's testimony that Plaintiff is limited to work that "static with few changes, or the changes clearly explained" is inconsistent with the RFC's limitation to work that involves no frequent duty changes.  (Doc. No. 22 at 7.)  The Court rejects this argument.  Plaintiff does not explain how Dr. Steiner's testimony and the RFC are allegedly inconsistent in this regard, nor does she cite any legal authority for the position that a limitation to "static work with few changes clearly explained" is necessarily inconsistent with the RFC's limitation to simple, routine tasks in a low stress setting including no frequent duty changes.

Smith, Demuth, and Matyi.  The Court finds it was reasonable for the ALJ to accept Dr. Steiner's conclusions.  As has been discussed previously, substantial evidence supports the conclusion that Plaintiff generally exhibited moderate symptoms and showed gradual, continuous improvement over time.  Moreover, as the ALJ correctly noted, Dr. Steiner had the benefit of reviewing Plaintiff's complete medical record, whereas Dr. Rao did not.  *See e.g., Werner v. Comm'r of Soc. Sec., 2013 WL 1137502 at * 6 (N.D. Ohio March 18, 2013)* ("[T]here are instances where it may be appropriate for the ALJ to look more favorably upon the opinion of a non-examining source, such as a medical expert, especially when the medical expert has access to the claimant's complete medical record and observed the claimant at trial.") (McHargh, M.J.) (citing *Compton v. Astrue*, 2012 WL 4473155, at *8 (S.D.Ohio Sept. 26, 2012) and *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011) (ALJ did not err in discounting treating sources' opinions based on testimony of ME who directly refuted treating physicians' findings)).  The ALJ's evaluation of Dr. Steiner's opinions is supported by substantial evidence.

Plaintiff's third assignment of error is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: April 11 2016